THOMAS ROSS *vs.* ROBERT L. KELLY and another, impleaded, etc.

October 9, 1886.

On Rehearing.   January 28, 1887.

Mining Corporations—Issue of Stock as "Full Paid."—A corporation formed for the business of mining, smelting, reducing, refining, and working ores and minerals, etc., may, under the provisions of Gen. St. 1878, c. 34, § 149, sell at less than par value shares of capital stock purporting to be full paid, and, if there be no fraud, the creditors of the corporation have no recourse against the purchasers or holders of such stock for the difference between the par value and the price at which they were sold.

Appeals by defendants Kelly and Heffelfinger from an order of the district court for Hennepin county, *Koon,* J., presiding, overruling their separate demurrers to the complaint.

*P. M. Babcock,* for appellant Kelly.

*Lane & Dodge,* for appellant Heffelfinger.

*White & Reynolds,* for respondent.

GILFILLAN, C. J. This action is brought against the Silver & Copper Island Mining Company, and Kelly, Heffelfinger, and Kimball, as its stockholders. Kelly and Heffelfinger interposed separate demurrers to the complaint, which were overruled, and an appeal taken. The complaint sets forth the articles of incorporation. From the articles it appears that the corporation was organized for the purpose of mining, smelting, reducing, refining, and working ores and minerals, etc.; that the capital stock was to be $2,000,000, to be divided into shares of $2 each, to be paid up, and not to be subject to any further assessment in the hands of the lawful holder or owner thereof, without his or their consent. The complaint alleges that 850,000 shares were issued, and 150,000 reserved to raise funds necessary to work and develop the mining property. November 28, 1882, a part of the shares reserved were, pursuant to a resolution of the board of directors, put up at auction, and sold, some at four, some five, and some at six, cents per share, each of the individual defendants purchasing some at such prices. The amounts bid were paid, and the certificates of stock issued to the purchasers, expressing on their face that the shares were non-assessable. Afterwards, plaintiff and one Nichols, under a contract with the corporation, did work for it to the amount of several thousand dollars. Nichols assigned to plaintiff, who recovered judgment against the corporation, on which execution was issued and returned unsatisfied, all the property of the corporation liable to execution being mortgaged far in excess of its value.

Plaintiff did not know of the sale of the stock till after the recovery of said judgment. At the times of making the contract to do the work, and the doing of it, the individual defendants were still stockholders. Plaintiff in this action seeks to charge them, as for unpaid subscription, for as much as the difference between the par value of the stock and what the defendants paid for it. The theory of the action is that the capital stock of a corporation is a trust fund for payment of its creditors; that persons trusting it have a right to assume that the amount of its stock issued indicates the amount of

actual assets in its hands, or subject to its call, to transact its business and meet the demands of its creditors; and that, therefore, a sale of its stock as fully paid up, for less than its par value, operates as a fraud upon those creditors who had a right to rely upon such stock as representing assets of the corporation upon which they might rely; and, if the corporation make such sale, the purchasers may be called upon by such creditors to make good, so far as necessary to pay their claims, the difference between the par value of the stock and the price at which it was sold.

This theory has strong considerations of equity and public policy to commend it, and it is also supported by the weight of authority in this country. Decisions of the supreme court of the United States directly and fully sustain it. In the case of corporations generally we see no good reason why the theory should not prevail. But the legislature has seen fit to make special provision respecting the disposal of stock by corporations for mining and smelting ores and manufacturing metals, etc. The provisions in regard to such corporations are contained in sections 144 to 154, inclusive, of chapter 34 of the General Statutes of 1878. Section 149 provides: "The stock of any such corporation shall be deemed personal property, and may be issued, *sold,* and transferred as may be prescribed by resolution or by-laws of said corporation, or its managing board; but no stock so issued or *sold, purporting to be full paid,* shall be subject to any further assessment in the hands of the lawful holder thereof, without his consent."

This provision for the sale of stock is peculiar to this class of corporations. The chapter contains provisions for the organization and management of all manner of corporations, except those of a municipal character, but there is no like provision in respect to any except those organized for the business of mining and smelting ores and manufacturing metals, etc. It is apparent that the legislature intended to make a distinction in the matter of the disposal of stock between those corporations and others. The clause quoted must be construed as authorizing such corporations to sell their stock for whatever they can get, without regard to par value. They may *sell* stock, *"purporting* to be full paid," though not in fact full paid, and,

when sold "*purporting* to be full paid," it is not subject to further assessment.   There is no further claim upon it.

The legislature probably took the same view of such corporations as is taken by the courts in California of similar corporations in that state.   In *In re South Mountain, etc., Min. Co.,* 7 Sawy. 30, (5 Fed. Rep. 403,) Mr. Justice Hoffman said: "The mode in which mining companies are formed in this state is familiar to us all.   The owners of the property, or persons expecting to become such, by complying with a few simple formalities, form themselves, with such others as they may take into the association, into a corporation, to which the property is conveyed.   The amount of the capital stock, which is required to be stated in the certificate of incorporation, is usually fixed at a purely arbitrary sum, and divided into as many shares as convenience or caprice may dictate.   It neither bears, nor is intended nor supposed by the public to bear, the slightest relation to the real value of the property,—a value nearly always conjectural, and very often imaginary."   Accordingly, it was held that creditors have no recourse against stockholders who had paid in property for stock declared to be fully paid up, for the difference between the par value of the stock and the actual value of the property.   7 Sawy. 30, (5 Fed. Rep. 403;) S. C. 8 Sawy. 366, (14 Fed. Rep. 347.)   Persons dealing with such a corporation must be held to do so with knowledge that its stock may have been sold at less than par, and purporting to have been full paid, that, if so sold, it is not assessable, and consequently that the amount of its stock outstanding cannot be relied on as indicating the amount of actual assets realized from its stock, and in its hands. There is therefore, if there be no fraud in fact, no equity in favor of creditors against the purchasers of such stock at such a sale.

Order reversed.

----

On a rehearing the following opinions were filed, on January 28, 1887:

GILFILLAN, C. J.   On the rehearing in this case we see no reason to change our former decision.   It is therefore adhered to, and the stay of proceedings vacated.

DICKINSON, J. I dissent from the conclusion of the majority of the court upon a reconsideration of the case, for the reason that, in my opinion, by force of the articles of incorporation specifying, as to the shares of stock, that they were "to be paid up," there was assumed the obligation, as respects creditors of the corporation, to pay in full the designated value of the stock taken.